Case number 26-1225, USA v. Jocelyn Benson et al. Oral argument, 15 minutes for appellant, 15 minutes to be shared by the appellees. Mr. Goldman for the appellant. Thank you, your honors, and may it please the court. David Goldman representing the United States of America. In Title III of the 1960 Civil Rights Act, Congress tasked state election officers with retaining and preserving a broad but discrete set of documents. All records and papers which come into their possession relating to any registration or application to vote. Congress further gave the Attorney General a right to those documents upon a written demand stating the basis and the purpose therefore. The district court in this court, in this case, created a carve-out for any state-generated record. That carve-out has no root in the statutory text, and it carves a hole in the Attorney General's investigative authority so gaping that the most blatant civil rights violations of the 1960s could have marched right through it. This court should reverse. I will begin this morning by talking about why a statewide voter registration list, or an SVRL, is a covered record or paper under Section 301 of the Civil Rights Act. First and most obviously, a statewide voter registration list relates to a registration to vote. I don't think that the district court or anyone in this case has really contested otherwise. Instead, the nub of this case has come down to whether an SVRL comes into possession of an election officer. It does. The operative word in comes into possession is possession or possess, which simply means that an officer of election must have control at some point of the SVRL, and there's no question in this case that officers of election did. Instead, would the district court— Counsel, I have just one question. Did we just view the words come into as surplus language? I mean, the statute could very well just say in possession. It could have, Your Honor. They're not surplusage, and I have a couple points to that. The first is that using the verbs come into means that we are focusing on that moment of first acquisition. So the officer of election must gain control of the record as an officer of election. And the second is that in focusing on a distinction between comes into possession and in possession of, the district court used a kind of statutory interpretation of looking at differing terms in one statute and applied it across different statutes. But as the Supreme Court said in Roussello v. The United States, that's not how we use that canon. And frankly, if I use my friend's logic of, well, why didn't Congress just say in possession of, I would ask, why didn't Congress just say an officer of election receives? That is a narrower term. Congress certainly knows how to use that. But doesn't receive—isn't one of the definitions of receive come into possession of? At least around 1960, isn't that the definition? No, Your Honor. My friends have cited definitions of receive that say come into possession of from an outside source. But the fact that you had to specify in the dictionary from an outside source just goes to show that that's not necessarily all instances of comes into possession. And again, I would stress that we're not looking at— What about just the common sense? I think they use an example. If you bake a cake, you don't say I came into possession of it. I produced it. I produced it on my own. I didn't acquire it. It didn't come into my possession. That would just be a really strange way to talk. Your Honor, even if that would be a strange way to only describe baking a cake, to take their example, it wouldn't be a strange way to encompass both baking a cake and buying a cake. If you asked me to inform you if I come into possession of dessert and I bake a cake, I think that you would expect me to give you a call when I pull the cake out of the oven. And that's what's happening here, is that comes into possession doesn't just cover self-generated documents. It does cover self-generated documents as well as those received from an outside source. Comes into possession provides a temporal distinction. So if an officer of election already had these documents, let's say in his personal capacity before becoming an officer of election, it's not covered by the statute. So the words have meaning. And again, I would look to other statutes if we want to play that game of looking at other statutes. Look at 18 U.S.C. 922. It uses the term possessed as well as received dozens of times because they do mean different things. Received is narrower than possessed. So there's really nothing to the district court's distinction here. So all of that is to say. Can I ask you a question? So this list, I think it seems to me it's kind of an aggregate of other information. You know, they aggregate this information and they put it into and make this list. Do the components of the list, do they come into possession at some point with somebody? In other words. The voter registration information that somebody comes into possession of it and then it it it makes it into this list as a component. Is that right? Well, the text looks at records or papers, so it's not about the data specifically. If the SPRL is just a compilation of different records, then yes, each one of those records when they come into possession of an officer of election is now covered under Section 301 of the statute. I think it's also important. My friends have focused a lot on the context in which the statute was created. But think about the consequences of their view or the attorney general could have requested registrations to vote by applicants of a particular jurisdiction, but couldn't have requested the actual list of who was accepted to vote, in which case I'm not sure how we would compare the registrations versus the ultimate product and see whether there was a violation there. If you want to take an even more extreme example, but sadly, potentially factual, let's imagine that a county registrar issued an internal memorandum saying in this county we do not accept applications for black registrants. Under their view, we could request the registrations, but we couldn't actually request that incredibly inculpatory memo from them because it's self-generated. Not only could we not request it, they also would not be forbidden. I mean, maybe you could request it, but just not under Title III of the Civil Rights Act. Maybe there's, you know, there's a different provision to request that. So I'm not sure exactly what that provision would be, but importantly, Your Honor, even if we they would not be barred under the Civil Rights Act from destroying it under Section 302. And we know from the legislative history that is cited by my friends, as well as various MIECHE, that a real concern was destroying these documents in order to avoid these investigations. Can I ask this? Do we analyze this under a Markwood analysis? It's not really clear from whether you agree that that's the analysis that applies. So is that the analysis that we use here? So I have two responses. The first is no, I don't think that's the appropriate analysis, but that the reason we didn't fight it so hard is because the district court reasoned that we satisfy the Markwood analysis. Why don't you think it's the appropriate analysis? So if you look at the statutes that are used in cases that apply to Markwood, as well as Powell, all of the statutes follow a particular structure. They provide an agency certain purposes that it can investigate, and then it says you can demand any document or request any testimony that is relevant to that purpose. So it makes sense for a court to have to say, well, in this broad range of documents you could request, let's make sure it's tied to a legitimate purpose. Let's make sure it is indeed relevant and make sure there isn't some ulterior motive. We have the exact opposite under the Civil Rights Act. Instead, there's no specific purpose that we are limited to. And instead, we have a discrete set of documents that we are entitled to. By definition, they are relevant to our request. And again, there's no particular purpose against which to measure it. So the Markwood test doesn't, it's really an ill fit in that context. Counselor, you keep referring to a list, but my understanding is that this is a list that's to ongoing change, correct? So this is not a static document. This is a list that be changed, I don't know, daily, weekly, monthly. So is the request that the state and that the secretary disclosed this very confidential information in many cases on just an ongoing basis? It seems that this would really result in the federal government having the sort of like superintending involvement in what is usually a matter that's left to the states, the election of officials. So just wondering, how would this be handled practically? Is the month? Thank you for honor. I would like to clarify, we have not asked them to continuously turn these over. We've asked for them at this moment in time. And in so far as there are any federalism concerns that you're alluding to, and that have been alluded to in the briefs, federalism is frankly at its nadir at this point, first of all, because we have Congress stepping in and giving the Attorney General a particular role in enforcing and supervising these duties. And second of all, we're working on the elections clause and the Supreme Court itself in the tribal case noted that federalism concerns here are really at their lowest because Congress was given a revisionary role, which is unusual. But I'll also point out this relates to the argument that has been made that by having to update these lists under HAVA, that somehow we are suggesting that state officials will be subject to section 302 liability. That's not true. By definition, HAVA says that retention of these documents includes updating them. So it certainly would not be willful alteration. We have to take the word. But section 702 seems to suggest that whatever documents that are being referred to in section 701 shouldn't be altered. And I think everyone agrees that the voter file is altered all the time, that HAVA requires states to alter them all the time. So how could this be something that fits within 701 if it has to be altered? Well, respectfully, your honor, I think that the way you're using alter is not the way that alter is used in section 302. We need to look at that verb alongside the others that are with it, which are destroy, steal, mutilate. That's extremely similar to the list of verbs that was an issue in Fisher. And Fisher, the Supreme Court said these are verbs that by their very nature refer to destroy the integrity or availability of evidence in the proceeding. So that's not what altering would do here. I will also point out that we can't overlook the important mens rea issue in section 302. It's willfully. I can't imagine how a court would say that it is willful alteration of a document to follow HAVA. And what I would say is that my friends here are trying to broadly interpret a criminal statute to encompass more liability. The fact is that courts do the exact opposite, sometimes maybe over the DOJ's objection. We interpret criminal statutes more narrowly, not broadly. So it's not- Can I ask you this? What document is the federal government referring to as its Civil Rights Act, as its demand, the demand that contains the basis and the purpose? Which document should we look at? I see that I'm out of time. Judge Melvin, do you have an answer? Yeah. Yes. So we have an explicit statement in our August 14th letter, and I think you need to read that in conjunction with our July 21 letter as well. In both of those letters, we state that we are requesting the SVRL for purposes of ensuring compliance with HAVA and NVRA list maintenance. So that would be where I would point the statement. So you're saying both documents contain the demand? Yes, they do. It's most explicit in the August 14th letter, but I think it would be a mistake to ignore the July 21 letter. Two quick reasons. First is because an ordinary observer, you're in a context in which you're a back and forth conversation. It's part of a continuing demand. Second, I would say that even if your honors disagree, I would point really quickly to the EEOC versus SVRLGAS case cited by the DMC amicus brief at pages four and seven, which had a very similar context and said, it's really harmless as long as the recipient had an opportunity to object. And we are absolutely not going to send this whole thing back to remedy a potential technical oversight in such a subpoena. Can I ask you, I think yesterday at some point there was an additional citation, the OLC opinion, just generally speaking, and I hadn't had a chance to look at it, but generally speaking, what is the purpose of an OLC opinion? The OLC opinion, those are provided to advise components within the executive branch. So they provide us legal advice that we are about to follow. And we provide that not because obviously it's bonding on this court, but to provide persuasive authority and to explain also the legal explanation and understanding that we are operating under and bringing these suits as well as these demands. Why would there be an OLC opinion after all the lawsuits have been filed and we're at the point, we're at the court of appeals, why would there be an opinion at that point in time, as opposed to before everything takes place? Sure. So things that OLC, like in any branch of the federal government, take some time. As the OLC opinion notes, it's memorializing advice that was given in early to mid-September. So the difference between that advice, which is informal, and now it's simply that it's gone through all the traps of writing a full opinion, it's undergone various site checking processes. I frankly can't tell you all the different steps they go through. I'm not part of OLC and so I unfortunately can't provide that for you, but it is memorializing advice as of September. And I think it's actually very explicit in various parts of the letter that it's not responding to various parts of the litigation because it's trying to keep the advice in the scope of what it gave us before it all happened. If I can ask just one quick question, Judge Nalbandi, and counsel, you referred to the demand letters as setting forth the purpose for the request, but you didn't address the basis. Are we to just read basis as the same as purpose in terms of the meaning of those two words, or do they have an independent meaning? And I'm just wondering to what extent the basis has been addressed by the Department of Justice. Yes, Your Honor. So we have accepted for purposes of this litigation that we have to state both a basis and a purpose because we believe that we've stated both. Most of the basis comes in the July 21 letter. For the reasons I've already explained, we think that needs to be read in conjunction with the August 14th letter. And so that's where most of the basis comes in. It's various eaves discrepancies. It's a complaint from a citizen about Michigan's compliance with HAVA. I will say it's certainly arguable that a statement of the purpose also covers implicitly the basis because as the investigative subpoenas and investigations is based on a suspicion or a wanting to quell any suspicions that there is wrongdoing. But I would point to the July 21 letter. Okay. Any further questions? No? Okay. You'll have your rebuttal time. Thank you. And we'll hear from counsel for the secretary first. Is that right? Correct, Your Honor. Okay. Good morning, Assistant Attorney General Heather Meyengas on behalf of Secretary Benson and the state of Michigan. Are you two covering different topics or you're fair game for everything? I think we're fair game for everything, Your Honor, both of us. Okay. The Department of Justice demands Michigan's electronic voter list containing the private information of 8 million registered voters. A demand that has been made of nearly every state is both unprecedented and as the district court correctly held, unsupported by the law. Counsel, can you spend just a couple of seconds explaining how the qualified voter file works, just how information gets on it, how it's taken off? Just a couple of seconds on that. Sure, Your Honor. I'll do my best. So information comes into the qualified voter file from a variety of sources. In Michigan, our elections are administered at the local level. So the people responsible for registering, processing paper for the most part are city and township clerks. So those clerks are principally responsible for entering information into the QVF or updating information into the QVF, depending on what sort of record or information the local clerks receive. The state also does some updating or maintenance in the QVF as well, based on information that the secretary of state might get consistent with sort of like NARA compliance or other information. Some information is sort of directly populated into the QVF as well, because in Michigan, voters can also register online and they can make address changes sort of online. So in those sense, the voters sort of interact directly. It's an interface and the information travels right through the QVF essentially and comes out to the local clerks for an update to to their registration file. So it's a big database. It contains lots of fields, lots of unrelated to voter registration, you know, itself. So it's a database that contains a variety of information from a variety of sources. But why do people? Can I ask a question? And so if when the local when the local officials are entering the info into the database, why isn't the information at that point coming into the possession of the secretary of state or the secretary of state's office? So, yes, there's a list, but it's made up of information that comes into possession of the secretary eventually. Well, I think because that's well, first of all, I'd like to back up a step and sort of make like a textual point about whether or not this is a record or paper for persons of the Civil Rights Act, right? Because we're sort of not focusing on a relevant phrase in Section 701, 207-01. The retention and preservation for the period of 22 months applies to records or papers, which come into the possession relating to any application, registration, etc., poll tax or other act requisite to voting in such election. Right. So the information that retained and preserved is information relating to the particular election. Right. So it's registration information. It's other records voters provide in the context of the particular election that we're retaining the records for. The statewide voter list is not that sort of record, right? The statewide voter list is a database that's updated routinely that is not going to reflect the voter list pertinent to the election that's the subject of the retention. So the material subject to the retention. So this is kind of a textual point that I think has been sort of overlooked in some of the briefing. The retention applies to materials specific to that election. So the statewide voter registration list as it is today or as we gave it to them. But why wouldn't that list, I mean, the list would pertain to every election, right? I mean, it's continuous. So why would it? But it's not, it's not, it's not the, it's not the registered list of voters for the election in question is the point I'm making in that phrase. But doesn't the registration, registration closes at some point for the fall election, right? You can register to vote in Michigan until election day, on election day itself. Okay, so it closes on election day? Yes, you could say that. So what we preserve... Why wouldn't that be the, I mean, that could be an operative date. You've got 22, you have to preserve the list as it exists on election day for 22 months. Well, but the statewide quarter file, we don't do that in the statewide qualify voter file. What you could be registered... Maybe you should, I don't know. Well, maybe, but what we hear by... But I don't know. No, I mean, it's not conserved, right? Because you could be registered on that for a lot of election and then move and be canceled, right? So when you get that list for September 15th that they got, that's not reflective necessarily of who was registered and eligible to vote for the election. So what we do preserve and what would be responsive is the poll list, the list of registered voters for that election. That's specific to the in such election language, right? We retain what's important, who's registered and eligible for that election. So those materials are preserved and those materials show who was a registered and eligible voter for that particular election. So when you get the statewide poll, if you ask for our database, the updated list, that's not going to be... You're not going to get information about necessarily who was registered and eligible for the particular election subject to the retention material. So that's why really the concept that the statewide voter registration list, the database, which is updated routinely because we must do it under NAVRA and HABA is a record or paper that has to be retained and preserved because it's always being altered, which implicitly section 207-01, 207-02 contemplates can't be done. Would you just take a moment and very... Because your time is expiring. Very quickly address the privacy concerns that are raised here. Sure, your honor. I mean, Michigan law makes driver's license information, social security numbers and full dates of birth exempt from public inspection, whether it's under a FOIA request or simply under some... It's barred from public inspection. And I think as we've noted in our briefing, many ports, most specifically in the NAVRA context have discussed the sensitivities of this very private information and why it should not be released. It threatens privacy, identity theft, all of these concerns. And so Michigan chose to exempt this information from public inspection, from being released on the list. But I think the government argues that the list would only be released to the DOJ and maybe Congress or committee of Congress. Something to that effect would not be released to the entire public. Well, I think that goes over then to the questions about whether the Privacy Act applies in this sense, your honor, which we've argued that it does. The Privacy Act, one of the principal arguments there is that the Privacy and retention of First Amendment information, certainly a voter list with all sorts of public and private information with it, that also could lead to this discovery. I'm sorry, I see my time is expiring. I may finish the question, the answer. Massing voter information that could also include how you voted in a presidential primary election is the type of First Amendment activities that is prohibited from collection under the Privacy Act itself. And so that's a principal argument for us there. So what's your definition of come into possession of, as is used in this statute, the federal government, I may be mischaracterizing the argument, seems to suggest that once the state voter file, once that's created, it has come into the state's possession. Why is that argument improper? Well, I think that the historical context of the CRA suggests what comes into possession means. It's the official who first comes into the possession of a voter registration or some other voter-related document subject to retention. And so secretary is not coming into possession of these records themselves. There are amalgamated, it's amalgamated, it's collected into this database that has already been in her possession, right? It's not, so to me, the text- But you are, I guess y'all are coming into possession of any registration, like a voter registers, that actual registration comes into your possession, or are you saying you don't come into possession? The record doesn't, the information does. And Title III doesn't talk about information, it talks about records and papers. So, you know, the secretary, we do not receive sort of records and papers from voters, right? What's entered into the QVF is what we obtain, you know, it's a collection of the information that other officials essentially, you know, unless it's sort of populated right through our driver file. So it doesn't seem to meet the test of what the CRA was talking about in those, in the 60s, and the purpose, right, was voters turning in their documents, right, their applications, their poll tax receipt, or their literacy test for taking that. And it's the first election, the official who gets that document sort of starts sort of this temporal or possession requirement. Okay. I'm over. Any other questions? Okay, we'll hear from Ms. Branch now. Good morning, and may it please the court. My name is Aria Branch on behalf of the intervener at Pelley's. This court should affirm the district court's decision below because the Civil Rights Act simply does not cover a state's unredacted voter registration list. And DOJ's to exploit the Civil Rights Act for its current dragnet simply resembles trying to fit a square peg into a round hole. It just doesn't work for some of the reasons that have already been discussed. Courts across the country have recognized as much with six courts now having dismissed their claims. Can I ask you a question? Can I ask you a question about this idea that self-generated documents are not covered by the statute? And I was looking at the 1959 report of the Civil Rights Commission, which I cited in your briefer and someone's brief. And it talks, some of the things it talks about seem to me to be self-generated. Receipts for paying a poll tax, which I assume the county clerk wrote the receipt, right? Or at one point it talks about the voucher card index, so the county keeps track of how many times a voter has vouched for another voter. And again, it looks like the county clerk is writing down that on an index. Is it your position that DOJ in 1962 or whatever would not have been able to get those documents under the statute? Our position is that the Civil Rights Act covers documents that election officials obtain or acquire from external sources and that it doesn't cover documents that are created by election officials, such as the statewide voter registration list. Okay, so if the county clerk, so if 10 people try to register to vote in 1962 and the county clerk records who paid a poll tax, who passed a literacy test, all this stuff that obviously we don't do anymore, and creates that list and notes, by the way, what race somebody is, right? So they're keeping an internal document. My understanding is your position would be that document is not covered because it's self-generated. But if that county clerk sent that document to the Secretary of State, like, dear Secretary of State, here's my report on how many people paid their poll tax in this county, that would then be covered by the statute because it into possession of the Secretary of State, even though it was self-generated by the county clerk? I think that is correct, Your Honor, that our position is that the Civil Rights Act doesn't cover self-generated records. And the reason for that is because the Civil Rights Commission was chiefly concerned with reviewing documents that were, for example, registration applications submitted by black or white voters. And the Civil Rights Commission was chiefly concerned with reviewing those documents to determine whether or not voters were being discriminated against. With respect to other documents that are internal, there would be other methods by which DOJ might be able to obtain those documents. For instance, DOJ could bring a lawsuit and obtain access to an internally generated document through the fruits of civil discovery. Under the current administrative framework. Okay, can I ask you a question, though, just to go back to that? If there's an internal document that relates to poll tax or something, but it's transmitted to somebody else, like, within the same, let's say, one county clerk sends it to a different county clerk or one county clerk sends it to the state secretary of state. Is that does that come into possession of the official who receives it? Or once it's self-generated, that's it. Nobody. It's never going to it's never going to be viewed as coming into possession. I think it would, Your Honor. And there's not anything in the record that explicitly talks about the ways in which poll taxes were paid and the papers that were associated with those payments. My understanding, based on some research that we've done, is that voters paid their poll tax to third party officials, and they may have received a document from that third party official. Then they presented that document to election officials. And so in that way, the receipt or document that evidences their payment of a poll tax would, in fact, come into the possession of election officials. And so I think it's important to think about the other documents that are listed in the statute. It's registrations, applications. Those are all documents that come from voters and they're not created by the state as the statewide voter registration list is. And I think to answer one of your questions earlier, Judge Nalbanian, just to expand upon that a bit, you asked about the 22-month temporal requirement and how that operates with respect to the statewide voter registration list. And I think that part of the statute, the requirement that election officials are required to retain and preserve documents for 22 months from the date of the most recent federal election, really highlights the fact, it really highlights another reason why the statewide voter registration list is important to the Civil Rights Act, because that temporal requirement, which is already in the statute, it makes sense to apply that requirement to a static document that doesn't change. For instance, a voter registration list that's associated with a voter being able to register to vote for a particular election. It doesn't make sense to apply that temporal requirement to a dynamic database that's constantly changing, that is perpetually maintained, and that compiles information across many different elections. And so I think that is one of many examples that we've highlighted in our briefing and that have come out throughout argument as to why the statewide voter registration list is simply not covered by the Civil Rights Act. There was another question that came up earlier with respect to transferring documents from local election officials to the Secretary of State, and if I may just address that question quickly. Section 301, as has been discussed, covers records and papers. It does not apply to information, and the district court pointed that out. So to the extent that a local election official receives a record or paper, that document would come into the possession of the election official. And then if it is transferred to the Secretary of State, it would also point, Your Honor, to Section 301 of the Civil Rights Act, which talks about transferring documents between election officials. And it says specifically that when a document is transferred from one custodian to another, the retention and preservation requirement applies to the later custodian. So if you read, come into possession to simply apply to transferring of that would render that language surpluses because it is already addressed by Section 301 of the statute. I see that I've taken my time, but I'm happy to answer any additional questions that the court may have. Any questions? No. Okay. Thank you. We'll hear a rebuttal. Thank you, Your Honors. I would like to hit three points, if I may. The first is going to this distinction between self-generated records and outside records. And I think for some of the reasons and examples Judge Nalbandian gave from the report of the Civil Rights Commission, the distinction doesn't make a lot of sense in the context of what the statute was trying to accomplish. So besides those examples, I'd also point out we cited a district court decision in a case called McIntyre, which talks specifically about requiring retention and preservation of tally sheets and poll lists, which are also self-generated. And I think that my friend made a point about that. That case didn't deal with the Civil Rights Act. I can't remember, maybe however, NBRA, it didn't deal with the Civil Rights Act, right? I believe that it dealt with retention and preservation under the Civil Rights Act. But even besides that, I'd also point to the fact that my friends have relied on the fact that the other documents cited in Section 301 might be submitted by voters. But again, the list is not exclusive. It's all records and papers relating to those documents. So it's not capped at those records. I also take this opportunity to say this relates a bit to our arguments about state redaction, which is if you take some of the examples that have been given, you have a state that is keeping registration and maybe also listing the race of the applicants. And maybe that correlates with yes or no on acceptance of the state under my friend's theory could just redact the race column to say, well, we're not collecting that at all. It makes no sense in the context of a pre-investigative statute to say that the recipients who are being investigated have free reign to redact the information on the documents we're requesting. And I'd also say that it's a little bit ironic that my friends are suggesting that what we should do is just sue the states and then get discovery for these documents when they're likewise complaining that we are demanding these records from too many states. But under their theory, we would have to pursue lawsuits without taking the opportunity to fully investigate the facts. That seems very counter to the statute and the purpose of that. Second, I'd like to also hit the alteration of documents. I would point this court to the 10th Circuit's decision in Voter Reference Foundation, which we cite in our May 4th 28J letter. That case didn't involve the CRA. It involved the NVRA. But the court did say that maintenance of documents under the NVRA is perfectly consistent with updating those documents under HIPAA. We think that the same reasoning applies here. And then lastly, I'd also say that a little bit about the Privacy Act. My friend from Michigan mentioned that. First of all, the SVRL itself is exempt from this First Amendment provision because it is pertinent to a law enforcement function that we are pursuing and it's also authorized by the Civil Rights Act. So it falls within that. As for other information, such as party affiliation, we would be willing on remand to consider potential redactions for that information, which we don't think is pertinent to our investigation. I see I'm out of time. Thank you, Your Honors. Any questions? No? Okay. Thank you all for your briefing on an expedited basis and your arguments today. They were very helpful and the case will be submitted and we will issue an opinion as expeditiously as possible.